LUTTIG, J.,
concurring in the judgment in part and dissenting in part.
The Kentuckians, the plaintiffs in this litigation, challenged a single fill deposit permit issued by the defendant Corps of Engineers to a single company, Martin Coal, and they claimed only that the Corps violated its 1977 regulations and section 404 of the Clean Water Act in issuing that one permit. The plaintiffs sought a declaration that the Martin Coal permit was unlawful under the 1977 regulations and an injunction prohibiting deposits pursuant to that permit. The only issue before the district court, therefore, was whether the permit issued to Martin Coal was lawfully issued under the Corps’ 1977 regulations which were then in effect.
Notwithstanding that this was the issue, and only issue, presented by the Kentuckians’ complaint, the district court never even addressed this issue. And not only did it not address this narrow presented issue; it wrote expansively on a wide range of other issues not presented by the plaintiffs at all, including the meaning of section 404 of the Clean Water Act, and the validity, not even of the 1977 regulations pursuant to which the challenged permit was issued, but of the new regulations jointly issued by the Corps and EPA in 2002, which regulations have no relevance of any kind whatsoever to the instant litigation. To add insult to injury, after addressing itself broadly to, and deciding, these issues that were not even presented by the complaint, the district court proceeded to issue a prospective in *449 junction based upon these roving interpretations, which effectively prohibited the Corps from issuing any permits in futuro for mountaintop removal mining in parts of five different states. Finally, completing its utterly bewildering treatment of this relatively straightforward case, the district court refused to enjoin the deposits authorized under the one permit that the Kentuckians actually did challenge, although it obviously believed those deposits unlawful.
It misses the mark to say, as the majority does, that the district court’s injunction was “overbroad.” Such an assessment implies that at least a part of the injunction was legitimate. But no part of the district court’s injunction was directed to the controversy presented by the plaintiffs, and therefore none of the injunction was legitimate. Indeed, at oral argument, even counsel for the Kentuckians freely admitted that the district court’s actions bore no relation whatsoever to the relief requested:
COURT: It seems ... that the district court here had the simplest and narrowest of cases before it and in the end that’s what troubled the court. It was not content with deciding the issue before it. It was told during the progression of the proceedings that there was a new rule and the court wanted to reach out and grab that rule and invalidate it. And the only way to do that was to go to the Clean Water Act straight ahead rather than to the existing regulation by the Corps. Because, as the district court said, it believed that regulation was just fine. But if it agreed that that regulation was fine, then all that it would be left to do is decide whether the permit issued under it was valid or not, which is a relatively menial exercise compared to invalidation, prospectively, of all regulations in all jurisdictions based upon an overarching interpretation of the Clean Water Act. But it seems that that’s exactly what happened here.
COUNSEL FOR KENTUCKIANS: That’s correct.
Oral Argument, Dec. 4, 2002.
As if pleased with the district court’s ex cathedra decision, the parties briefed the appeal as if all of the issues decided by the district court not only were raised by the complaint but properly decided by that court. Thus, the Kentuckians argue fervently that the district court’s interpretation of the Clean Water Act is correct, and the Corps and Intervenors argue just as ardently that the 2002 regulations are a permissible interpretation of that Act. And like the district court, all of these parties ignore entirely the sole issue actually presented for review in this case.
The role of the appellate court in theory, of course, is to right the legal wrongs that occur in the district courts and, in the course of so doing, to explain to the parties the error in the arguments they advance in defense of and challenge to the district court’s judgment. But rather than right the palpable wrongs of the district court, and explain to the parties wherein their errors lie, the majority instead adds to those wrongs by proceeding precisely as did the district court, and as do the parties, simply reaching different conclusions from those reached by the district court, and aligning itself with one side to the litigation rather than the other. Thus, just as the district court was not content simply to address the issue presented to it, so also is the majority discontent to address only the issue presented to us. Repeating in reverse the errors committed by the district court, the majority wades knee-deep, and without apparent hesitation, into the very issues that were improvidently decided by the district court and argued by the parties (and more), concluding, among other things, (1) that the meaning of the term “fill material” in section 404 of the Clean Water Act is ambiguous under *450 Chevron step one, (2) that the Corps’ interpretation of its 1977 regulation is neither plainly erroneous nor inconsistent with the text of the 1977 regulation, (3) that so construed, the 1977 regulation is a permissible interpretation of the Clean Water Act under Chevron step two, and, last but not least, (4) that the issuance of the Martin Coal permit by the Corps was not arbitrary and capricious. Of these issues decided by the majority, only the first was actually passed upon by the district court, and, as noted, it improperly so.
Proceeding ex cathedra in this fashion, the majority, as might be expected, falls headlong into the very pitfalls that are generally avoided by simple adherence to the prudential rule against decision of issues not presented. To take one, but one exceedingly important, example, the majority concludes confidently, at the heart of its opinion, that it must defer to the Corps’ interpretation of the Corps’ 1977 regulations. But the Corps has not provided this court with any interpretation of the 1977 regulations, for the understandable (even if, at this point, comic) reason that the district court did not hold as to the interpretation of these regulations or the lawfulness of the Martin Coal permit under these regulations, and thus there is no judgment on this issue from which to appeal and on the basis of which to marshal argument.
When asked by the court at oral argument whether there was “any substantive difference between the new rule [the 2002 regulations] and the old rule [the 1977 regulations],” counsel for the Corps did reply, “there is a word difference and a substantive difference. The prior rule says that material deposited just for waste should be regulated under section 402 of the Clean Water Act.” Oral Argument, Dec. 4, 2002 (emphasis added). But of course, if anything, this statement at least suggests that the Corps’ interpretation of the 1977 regulations is different than that interpretation that the majority ascribes to the Corps and then defers to.
Rather than acknowledge that it actually has no idea how the Corps interprets the 1977 regulations, the majority goes outside the litigation in search of an interpretation to which to defer. But its search yields neither an interpretation nor competent evidence of the Corps’ interpretation of these now-superceded regulations. The putative agency interpretation to which the court so eagerly defers is constructed by the majority almost entirely from statements made in the course of promulgation of, not the 1977 regulations in question, but rather, the 2002 joint Corps/EPA regulations.[1] These statements say nothing more than that the 2002 regulations are consistent with the superceded EPA regulations and the agencies’ regulatory practice. They also describe the agencies’ vision of areas that are appropriate for section 404 regulation, but are quite careful not to say that the 1977 regulations covered those areas. Thus the statements on the basis of which the majority infers the Corps’ interpretation say nothing at all about the agency’s interpretation of the 1977 regulations, leaving it quite possible, as the Kentuckians contend, that the Corps’ regulatory practice was inconsistent with its own 1977 regulations, (which prompted promulgation of the 2002 regulations) — a possibility not as much as considered by the majority.
*451 Rather than “overlooking” the 1977 and 2000 statements by the Corps in the Federal Register, I have actually read those statements carefully which, I am not sure the majority has done. If it had, it would be clear to the majority as well that in neither place does the Corps “state its interpretation of the 1977 Regulation,” ante at 446 n. 3. This is my entire point, namely, that nowhere does the Corps state what its interpretation of the regulation is. The sleight of hand employed by the majority in footnote 3 is its equation of “practice” with “interpretation.” In the 2000 and 2002 Federal Register statements, the Corps does describe its practice but it does not, despite the majority’s assertion otherwise, state its interpretation. Of course, in the 1977 Federal Register it states neither. In the absence of a stated interpretation, of course, the “additional approach” referenced by the majority in the same footnote is meaningless, because it is unknown whether the “Corps’ regulatory practice reflects its interpretation,” ante at 446 n. 3. The only authority offered by the majority in support of its approach, Udall v. Tollman, is inexplicable given that (even according to the majority) there was in that case a longstanding administrative interpretation of the two Executive Orders to which to defer.
I credit my colleagues with going the extra mile and reviewing the ten years of correspondence between the EPA and the Corps, see ante at 444^45, in an effort to identify an agency interpretation of the regulation at issue. Of course, that through this exercise all it learns is that there has been a division of authority between the EPA and the Corps only confirms what has been the futility in its overall enterprise to divine an agency interpretation. For, the fact that the EPA and Corps have divided and shared authority bears not at all on the regulatory interpretation espoused by either, although the majority. evidently believes otherwise. And this is not to mention that the block quote featured by the majority in conclusion is not even that of the Corps or a Corps official but rather a statement of an EPA official. See ante at 445.
Even if the Corps had interpreted the 1977 regulations as the majority believes it had, it is not clear that that interpretation is due any deference. As the majority correctly recites, the agency interpretation must not be “inconsistent with the text of the regulation.” The 1977 regulations defined “fill material” as follows:
any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a[ ] waterbody. The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under section 402 of the Clean Water Act.
33 C.F.R. 323.2(e) (2001) (emphasis added). While the majority asserts that the Corps’ assumed interpretation is consistent with the term “waste” as used in the regulations, it completely fails to analyze whether that interpretation is consistent with the “primary purpose” test also established by the regulations. And how the deposit of mining spoil into waters of the United States for purposes of disposal has the primary purpose of creating dry land or elevating the waterbody is, at the very least, not immediately obvious.
None of the above is necessarily to disagree with the ultimate conclusions the majority reaches with respect to any of the issues it decides, although I do suspect that it might be incorrect as to one, if not more, of those conclusions. It is, however, to highlight the weakness in its analysis and thereby the perils that inhere in deciding issues that have not only not been briefed or argued by the parties, but have *452 not even been decided by the district court whose judgment we review.
Rather than embark on the treacherous course chosen by the district court and the majority to resolve all issues, regulatory and statutory, that are presented by the deposit of mountaintop fill in waters of the United States, I would confíne myself to the narrow issue presented by the case.
As the parties readily acknowledged at argument, there was no need for the district court (and there is likewise no need for this court) to interpret the Clean Water Act, or the 2002 jointly-promulgated regulations. When asked by the court the following, “you don’t believe that the district court was required to address the Clean Water Act at all, do you? You believe that this deposit of waste was invalid under the existing Corps rule,” counsel for the Kentuckians replied “Correct.” And counsel for the Corps similarly affirmed that “th[is] court doesn’t need to get into the construction of the Clean Water Act.” And I would say nothing about either.[2] I would address only those claims presented by the Kentuckians in their complaint, and I would further limit myself to deciding only the subset of issues presented on appeal.
In this case, the sole issue on appeal is whether the district court’s judgment and opinions, which confront issues not raised and grants relief no party requested, all the while failing to reach the one issue actually raised, were proper. Clearly, neither is. As a result, I would vacate the district court’s entire injunction and its opinions and remand for consideration of the only issue that has ever been presented by these parties' — the lawfulness of the Martin Coal permit under the Corps’ 1977 regulations. If a new judge is not to be designated, the integrity of the judicial process requires at least that we wipe the slate clean, returning these parties to where they started, and require the district court in the first instance to decide the issue presented by the complaint — and only that issue — after which a decision on the merits of the dispute would be in order. As currently postured, the case is, to cast legalese aside in favor of clarity, upside — down. And no amount of disquisition undertaken from the same essential procedural perspective of the district court can turn it upright — not even one, as the majority’s, that arrives at conclusions diametrically opposite those reached by the district court.

. The majority also points to certain statements in the Federal Register regarding the "waste” exclusion in the 1977 regulation. Not only do the quoted portions not speak to mountaintop overburden, which is what is at issue in this case, but they also do not address the primary purpose test established by the 1977 regulation.

. Contrary to the suggestion of my colleagues, I do not "assume! 1” that the agency acted within the scope of its statutory authority. Ante at 440 n. 2. Neither do I assume that the agency acted within the scope of its regulatory authority. Indeed, I have raised questions about whether the agency acted in compliance with its authority under both the regulation and the statute.
The paragraph in the Kentuckians' complaint cited by my colleagues for their assumption that the Kentuckians challenge both the regulation and the Clean Water Act does not at all convince me that the Kentuckians has done so; in fact I understand that paragraph, without more, and also the complaint as a whole to challenge only the issuance of the permit under the regulations. It is only this understanding that can logically be reconciled with the Kentuckians' undisputed challenge to the Martin Coal permit only. The Kentuckians argument is, quite simply, and has been from the outset that the issuance of the Martin Coal permit violated both the regulation and the statute. The Kentuckians has never argued, as they orally affirmed before us, that the 1977 regulation is incompatible with section 404 of the Clean Water Act. Of course, that the district court decided the statutory question is of no moment to me whatsoever because, as I have explained, the district court reached and decided every possible issue it could, except the only issue presented in the case — as does the majority.